[Civ. No. 1520. Third Appellate District.—August 8, 1916.]

## ROY E. ARUNDELL, Respondent, v. AMERICAN OIL FIELDS COMPANY (a Corporation), Appellant.

EVIDENCE—PROOF OF FACT BY INFERENCE.—Direct evidence of a fact in dispute is not required in all cases, as the law recognizes the force of indirect evidence which tends to establish such fact by proving another, which, though not in itself conclusive, affords an inference or presumption of the existence of the fact in dispute.

ID.—NEGLIGENCE—PROOF BY INDIRECT EVIDENCE.—Negligence, like any other fact, may be inferred from a preponderance of the evidence, whether it be circumstantial or direct, and the plaintiff is not required to prove his case beyond a reasonable doubt.

ID.—INJURY TO TOOL-DRESSER ON OIL DERRICK—FALLING OF IMPROPERLY HOISTED CASING-PIPE—INFERENCE OF NEGLIGENCE.—In an action for damages for personal injuries sustained by a tool-dresser in a derrick for drilling an oil well from the falling upon his hand of a joint of casing-pipe which he and the driller in charge were endeavoring to hoist from the well, the negligence of the defendant is sufficiently proven by evidence that the driller adopted a plan of handling the pipe, which was testified to by experts as unsafe, and by not using the elevators provided for the purpose.

ID.—MASTER AND SERVANT—RISKS OF INJURY ASSUMED BY SERVANT.— The ordinary risks which a servant assumes as incidental to his employment are such as may not be avoided by the exercise of reasonable care by the master or by his servant who is superior to the injured servant.

ID.—INSTRUCTION—SYMPATHIES AND PREJUDICES OF JURY—PROPER REFUSAL.—An instruction to the effect that the jury should not be

governed by sympathy but by the evidence, and that in considering the evidence the jury should not be influenced by the fact that the plaintiff is a laboring man and the defendant a corporation, is properly refused.

APPEAL from a judgment of the Superior Court of Kern County, and from an order denying a new trial. J. W. Mahon, Judge.

The facts are stated in the opinion of the court.

Olin Wellborn, Jr., and George E. Whitaker, for Appellant.

Shepard & Alm, and J. R. Dorsey, for Respondent.

CHIPMAN, P. J.—Judgment for ten thousand dollars followed the verdict of a jury as damages suffered by plaintiff for the loss of his right hand while in defendant's employ. The appeal is from the judgment and from the order denying defendant's motion for a new trial.

In 1910 plaintiff, then twenty-three years of age, worked for defendant for about six months, receiving $3.50 per day and board, including Sundays. He had had some previous experience in the oil fields, being employed principally as a "roustabout." For some weeks previous to November 15, 1910, he had been employed by defendant as a "tool-dresser," and was working in that capacity on that date. He commenced work at midnight, the accident occurring at about 4:30 o'clock in the morning. The only other person at work on the derrick at the time was one A. F. Mellen, designated as a "driller."

Plaintiff's testimony as to what he was doing and the cause of the accident was as follows: "I was jarring on a pipe, running the spear to the bottom of the pipe, and jarring it up trying to free the pipe to get it loose in the well—it was froze. The well was somewhere in the neighborhood of two thousand feet deep. A spear is a contrivance you put on the tools, the same as you do a bit, then you can go down into the casing and take hold of it. The string of tools was about forty feet long. It may be a little more with the spear. I continued jarring on the pipe two or three hours. After I was through jarring I pulled on the casing, trying to pull it loose. I got it partly loose, then I parted the pipe; it was

hard to tell where. By 'parting the pipe,' I mean pulled it in two. I next tried to take the spear out of the hole. I didn't succeed, because the top joint was crimped near the top, and the spear would not come through. We had to take the joint out and get it out of the road—the top joint. I unscrewed it. In the first place Mellen and I had to unscrew this joint loose from the rest of the pipe. We both helped to do it. After that was done I put a rope on the pipe and Mellen pulled it up in the derrick. If I remember right, I mentioned the fact about using elevators, I said that to Mr. Mellen. He said, 'No,' to use the rope. I tied the rope on with a timber hitch just below the collar, probably six or eight inches, maybe a foot. The collar is about six inches wide. The rope was about an inch or a little more thick. It was a strand out of a drilling cable, about ten feet long. After tying the rope to the pipe I hooked it on to the block-hook. It had an eye in it. Block-hook is what they generally use for handling casing, the one that is permanently in the casing block. I slung the eye of the rope over that hook in the casing block. Mr. Mellen pulled the casing up in the derrick with the casing block by means of the engine and apparatus. At the time he was at the throttle. You can reach it from the derrick floor. This happened about 4 or 5 in the morning. It was dark. I could see about twenty foot in the derrick; above that I could not distinguish anything. After Mellen had hoisted that pipe I pulled the tools up and took that spear out. I lifted the tools just high enough so that I could take the spear off. It was on the lower end. The spear got above the floor. Mellen told me to elevate the tools at that time. Mellen had not got around to helping me yet. I put on the wrenches to break the joint. It would not take me but a few minutes to loosen that joint. When I removed it the tools were naturally moving around to a certain extent; jarring them, rather. They were practically perpendicular all the time but they would swing. I did not lower or elevate them. We didn't get the spear loose. This joint of pipe fell and caught my hand. I had my hand on the spear at the time. I just started to steady the tools to put on the wrench. The pipe dropped down around the tools. It struck me back of the thumb joint on the wrist. It removed my thumb, two fingers, and part of the others. The pipe was six and five-eighths inches in diameter. It weighed,

I think, twenty pounds to the foot. It was fourteen or fifteen feet long. . . . They amputated the hand at the wrist in the hospital.''

Defendant makes the following points against the validity of the judgment: 1. Insufficiency of the evidence to show how the accident happened; 2. Contributory negligence; 3. Plaintiff assumed the risks of the employment; 4. Plaintiff was not injured by the negligent act of an employee ''having the right to control or direct the services'' of plaintiff; 5. Errors occurring at the trial.

Plaintiff's testimony above given conveys some notion of how the accident happened, but it becomes necessary to inquire further into the particulars and plaintiff's relation to the work in hand. Much testimony was given explanatory of the relative duties of the driller and the tool-dresser in a derrick for drilling an oil well. Witness Crites, who was superintendent of the Peerless Oil Company in the Kern River field, and had been in the oil business continuously since 1896, ''in the operating department, drilling wells, etc.,'' and was ''familiar with the custom and manner of performing work in and around derricks,'' testified: ''The driller is a man that has charge of the tools, and you look to him, of course, to do that part of the work. The tool-dresser's business is to help the driller. If there is a boiler, he takes care of the boiler; keeps the fire up and keeps water in the boiler, and attends to the work in and around the rig that the driller requires of him; dressing bits, helping him in all sorts of ways around the derrick. The tool-dresser has certain duties which are strictly his duties, and the driller has certain other duties which are strictly his duties. As to the general work, the driller is boss of the rig and directs the work in and around the derrick. In the performance of work that requires both the tool-dresser and the driller to lend a hand, the driller directs the work. Attending to the boiler is one of the routine duties that the tool-dresser is supposed to do. If he wants any help, he usually asks the driller to help him. In the actual work of sinking a well, handling the tools, hoisting the casing, and such matters, the driller directs that work. The driller controls the derrick, directs the tool-dresser in and about his work in the derrick.'' Other witnesses described the driller as ''the man that does the work inside and does the directing of it. He is supposed to be boss when

he is on tower.'' (''Tower'' means the same as ''shift'' in other mining operations, and in plaintiff's case was from midnight until noon.)

Witness Harry Arundell, who was ''lease drilling superintendent'' of defendant company, testified to the duties of the tool-dresser and driller. ''The tool-dresser's duties are to fire and look after the boiler, take care of the engine and assist the driller around the rig, under the driller's orders. He works under the driller's orders entirely; the driller in a derrick has, in a way, a right to control and direct the services of the tool-dresser at his work. All the tool-dresser's work is generally under his supervision. He has to do the work to the driller's satisfaction. The meaning of 'tool-dresser' is dressing and sharpening tools. . . . In this line of work it is necessary to use a timber hitch almost every day around a drilling rig, particularly hoisting pipe. If a timber hitch is properly tied with a dry rope, it would not permit a pipe to slip from the rope and fall; it could be tied with a wet rope so that it can't slip. A wet rope would be stiff and hard to use, and would not draw down tight, and would have a tendency to open up if the weight was taken off of it. . . . The scope of the duties of driller and tool-dresser are understood by them usually so that they can work without much said. Ordinary work, sometimes very little spoken; ordinarily each knows his duty and goes ahead and does it. It was the duty of the tool-dresser to step to the throttle when the tools started up, and to run the engine while the tools are hoisted out. Custom made it the duty of the driller to be at the throttle when the pipe was hoisted. It is the tool-dresser's duty, under the driller's supervision, to fasten the hoisting block and hook to the pipe.''

It is not necessary to quote further from the testimony as to the relative duties of the driller and tool-dresser. There is but little difference between the testimony of plaintiff and defendant on this point, and there is substantial agreement that the driller is the directing head of the work in the derrick and controls the movements of the tool-dresser.

A. F. Mellen was the driller in charge of the work when the accident occurred. He and plaintiff were the only persons present. His deposition was taken by defendant and was introduced by plaintiff and read in evidence. As to the accident he testified: ''It is a kind of a mystery how the joint

of pipe happened to fall. In raising the pipe to strip the tools through it while taking off the spear the pipe fell—fell from up in the derrick. We pulled it up there with a block and tackle, the casing-block—I did. It was fastened to a sling made of rope. Arundell fastened the rope to the piece of pipe that fell. It was his duty. He knew how to fasten it. Nobody directed him how to fasten it. As a rule, we generally kept the block and tackle on the hook all the time. It is a tool-dresser's place to put that on; it is almost always carried on the hook. The elevators generally hang on them. The elevators are used to put in a long string of pipe; and the sling is used for a small article. As a general thing, they were both of them hanging on the same hook. I don't know whether they were on that night—as a rule, they were on. I hoisted the pipe up with an engine. I ran the engine. . . . I could not say how high I hoisted it. All that I had to go by was the lines. I figured on hoisting it to the blocks at the top of the derrick—probably forty feet. Arundell hooked it on. I could see for myself that the pipe was unscrewed when I hoisted. . . . The rope was put on after the pipe was unscrewed. While Arundell was putting the rope on it I was at the engine. After I helped to unscrew it I went to the engine and told him to let the blocks down while he connected with the rope. I saw when he got the rope finally connected. When the rope was on I hoisted it. I could see for myself it was ready to be hoisted. I could not say definitely how high I hoisted it; I figured on how much line I had. I went by the coils on the shaft. I took the blocks to the top of the derrick, at least forty feet from the bottom of the floor. I had a way of ascertaining whether it was at the top or not. It could not have been from the top six or eight feet. I don't know just exactly. . . . It was dark at the time I hoisted it. I didn't look up to see.'' It appeared that the derrick was lighted by four incandescent globes of sixteen-candle power and so placed under the roof of the derrick that they cast no light in the open space above the roof into which the pipe was hoisted. The roof was about twenty feet above the floor. The witness, continuing, testified: ''I don't know how the pipe happened to get loose from the rope that Arundell fastened it to. The rope didn't come down with the pipe; it stayed on the hook. When we took Arundell to the doctor, the rope was hanging on to the

hook with the timber hitch still in it; that showed it slipped—showed the pipes slipped out of it. . . . I am sure the pipe slipped down the rope; the rope was still on the block and the timber hitch was still in it when I came back; that was after 7 o'clock. Arundell was hurt between 4 and 5. . . . When I hoisted the string of tools up I didn't hear any blow or jar as if it had hit up there. I didn't feel any indication of the tools hitting the pipe when I ran the engine. It seems like you could have felt such a thing. The only thing I could figure on why the pipe slipped through the rope and came down, it must have become loosened—picked it up on the tools. That was a theory; I have no knowledge. . . . When you can see in the daylight it is the tool-dresser's duty to watch for that. In the dark he could not see. . . . The man at the throttle who is hoisting it could not see it at the same time he was performing his duty at the engine there—it is impossible. . . . The man at the engine could not see anything in the top of the derrick. On the night in question I hoisted this block to the top of the derrick as far as I could possibly do. I had six or eight feet more to run—I mean I could hoist it further. . . . I don't think it was possible to escape my attention, if it had been so adjusted that there was danger of it slipping out; at that distance it seemed all right. The rope knot was on the side away from me. I could see the turns of the rope on the pipe next to me.'' He testified that after he had hoisted the pipe he set the brake to hold it with the calf-wheel and then pulled up the tools preparatory to taking it off the spear. ''While I was letting it back again so the spear would not have to drop far it stuck a little, enough to turn a twist in the rope two or three times when Arundell started to take it off. Of course, while he was doing that, I was letting it down with the brake. When I got it down two or three inches of the floor I went to the tools myself, and had just got hold of them with my hands when I heard this racket; that was all there was to it.'' On cross-examination he testified that when Arundell tied ''that knot around the pipe it was pretty close to the collar; he tied it two or three inches. The collar is about six inches; it was eight or nine inches from the top. We lifted three or four joints of pipe with the same knot. It didn't show any tendency at that time to slip.'' He testified that ''the closer you get to the collar the better it is, as they most always slip

some; and for that reason it is better to tie as close to the collar as you can."

Plaintiff testified further: "At the time this accident happened it had been raining—everything was wet and slippery. There is always an opening in the center of the roof of the derrick. Of course, directly under the roof would not much water fall. The roof came to a peak, like this [illustrating], about three or three and a half feet opening clear across the derrick the full width of the rig from front to back. The roof covers each side; leaves the center open. . . . I didn't have anything to say about how the hoisting of this pipe and the removing of the spear was to be done. All told, I had worked in and around oil well derricks approximately five or six months. No similar state of circumstances arose in my experience during that time. It was the first time that I ever had exactly that kind of work to do, and it became necessary to remove a joint of casing out of the well in order to remove the spear. I personally tied the knot by means of which that particular pipe was hoisted. I tied a timber hitch. [Witness illustrates.] I tied a safe knot; I tied it in the usual manner. I had been experienced in tying knots of that kind ever since I had been working in the oil business. The tying of that knot is a frequent occurrence; use those knots every day. I could not say how high that pipe was hoisted by Mr. Mellen, because it went up where there was no light. It was none of my business to pay any attention to that. . . . There were no lights above the roof. The roof is about twenty feet high above the floor, I judge. . . . During the daytime or daylight I could have seen the position of the pipe, and the man who hoisted it could see; not after night. He could in the daytime by stepping out just a little. He could still hold the throttle and look up to the top of the derrick." On cross-examination he testified that he had worked there for four months and was fit for the work he was expected to do, although he "was not what you call an experienced man in particular"; that "the string of tools would be about forty feet from where the cable joins the rope-socket down to the bottom of the spear." A working model of a derrick in operation was brought into court by defendant and used in the examination of witnesses. Plaintiff was called upon to and did illustrate by this model with much particularity how he and Mellen conducted the work before and up to the time

of the accident. Not having the model before us, we are deprived to considerable extent of the advantage enjoyed by the jury. There was testimony of several witnesses to the effect that it would have been the proper thing to do, and safer, to have hoisted the pipe with the elevators. Plaintiff testified: ''The elevators which I had been using when I broke the pipe ['by ''broke'' we understand is meant unscrewing it] were set aside on the derrick floor. The elevator block was hanging somewhere in the derrick. I got that down far enough to hook the rope into it; then I pulled the pipe up in the derrick. After I hooked one end of the rope to the hook, one end was already on the casing, I tied the rope to the casing—that is the timber hitch I refer to in my testimony." He then described how he hoisted the tools high enough to get at the spear which was at the lower end—''high enough to unscrew it. The next step was to take the spear off. . . . When I was proceeding to unscrew the spear there, the joint of pipe that was held in the air dropped. The rope that held it did not break; the rope did not break loose from the hook; the rope remained aloft and the pipe came down. . . . Mellen was presumably at the throttle during the lifting of the pipe. . . . I knew my duties and went ahead with the performance of them; Mellen knew his duties and went ahead with the performance of his.'' On redirect he testified: ''I mean by saying I knew my duties, as I testified a moment ago, that I knew my duties as tool-dresser; that is, when I was told to do anything I knew how to go around and do it. . . . I don't know of my own knowledge that the pipe slipped through the knot; I know by what Mellen said afterward. If I remember right, I asked before I tied this rope around there if we should not use the elevators—something to that effect. I did not have any particular reason for that, only I just took it that that would be the best way in doing it. He told me to use the rope.'' On recross: ''Q. Did Mellen give you any directions about the tying of that knot, or any advice or any suggestions or anything, or did you know? A. I knew what knot to use.'' His attention was called to testimony he had given, as we understand, in a deposition: ''Q. Did the pipe go clear down or was it stopped by the piece of rope with the eye in it which was fastened to it? A. It dropped through the knot. Q. It did not break the rope, then? A. No, sir. Q. But it slipped down there

through the knot which you had tied around it and came through it? A. Yes, sir. Q. How did you ascertain that? A. Because it could not possibly happen without—that is, it could not have slipped through the knot without the pipe was raised and the weight was taken off the pipe to let the knot become slack. Q. How did you know that the knot was slack? A. The pipe could not have slipped through it without it did. Q. Could not the rope break? A. The rope did not break. Q. Did the rope remain hanging on the block-hook? A. Yes, sir. Q. So that your theory of the manner in which the accident happened is that the tools were hoisted in such a way that they lifted the pipe enough to shake the rope loose from it sufficiently to let it drop down through the knot? A. Yes, sir. Q. You believe that is the way the accident happened? A. Yes, sir.''

Expert witnesses were called by plaintiff to explain what they regarded as the proper and safe way to remove a spear from the tools under circumstances such as existed in the present case. Witness T. Phillips, a driller of many years' experience, testified: ''I was running the opposite tower the day Mr. Arundell was injured. There are two towers—the morning tower (from noon to midnight) and the afternoon tower (from midnight to noon). . . . Assuming that the top joint was crimped, so that the spear would not pass through it, and assuming that I wanted to remove the spear from the lower end of the tools, the only way to go about it is to bring that spear up and take it off. I would take off the top joint of pipe and take it off. I would hoist it that high, probably [demonstrates with model]. I would only hoist it above the floor here high enough so that I could break this joint. About there is where I would put the casing [demonstrating]. I would suspend the casing about at that point, with the brake on the calf-wheel; it would not be over three or four feet. . . . I would break it and take the spear off, then let the casing down and pull the tools out through it, . . . and after you get your tools out there is nothing in the way of putting the pipe anywhere you want to. I would take the elevator rather than use a one-inch manila rope to hoist it with. I think it would be more safe; with that rope there is a chance of slipping. Where the elevators are fastened on to the casing there is not much chance in the matter. If I merely hoisted it up that distance, there is a chance of the

rope slipping; there is always a chance if the rope is wet; there is a chance for it to slip. It was raining that night; it had been raining when I went off tower. I don't think it is safe to hoist that pipe a greater distance than that under any circumstances—not with a hitch on, because, you see, if that rope is wet there is a chance for it to slip—anything loosens it up it is liable to slip through and you once loosen it and it won't take hold again. It would not be apt to slip without anything interfering with if it it was properly tied. There would have to be something to interfere with it if it was drawn up by a knot properly tied. . . . Up that high it is pretty close to the center of the derrick or to the pipe. Of course, there is a chance for it to swing over and catch.'' Given the circumstances in this case of the pipe hoisted up toward the top of the derrick and that the tools were hoisted out of the well so as to reach the spear to take it off, and in attempting to take it off the pipe fell, he testified: ''I would say that there is only one chance to cause the pipe to fall. If the knot was properly tied, the only chance would be catching the tools on to this pipe and raising it up and lifting the weight off the rope. The tools were approximately forty-five feet in length. A pipe being hoisted in that manner, assuming it to be a fourteen-foot pipe with a rope, say eight or ten feet, that would have to get very near to the top to clear it from the tools.'' Referring to the manner the pipe was hoisted and its height in the derrick, he testified: ''I should think it would be carelessness in a man to hoist it up where it was.''

Other witnesses expressed similar opinion, though one or more testified that the upper joint of pipe should be unscrewed and drawn up a few feet above the floor of the derrick—three or four feet—and the tools then drawn up through the pipe and the spear taken off at this opening in the pipe. The tools could then be drawn up through the pipe and disposed of, the pipe screwed on again and let down into its place or laid aside if faulty. But all agreed that the pipe need not and should not be raised but a few feet above the floor.

Witness Cox testified: ''If I should hoist it [the pipe] up that way and then afterward hoisted the tools up so as to get at the spear; assuming that it was dark and I could [not] see any distance above the top of the roof there, I would not really know when I had that pipe in a safe place—I suppose

it would be guesswork. I would not guess at it, I would not pull it up there; if I did I would use the elevators. If I did pull it up with a rope, it is liable to fall—to come in contact with some part of the rig that you could not see or something, and the rope might slip. If you hoisted the tools in order to get at that, in order to get at the spear, assuming the tools were about forty feet in length, the rope-socket would not likely pass through the pipe without catching on the bottom of the pipe. If the pipe was tied up by means of a rope—a sling—there would not be much chance to pull it up without hitting the bottom of the pipe. The pipe would not hang perpendicular; in my opinion, the tools would probably catch on the side of it. The chances are that would have an effect on the knot or rope, it would loosen up your knot; if your rope was wet or stiff, or a new rope, it would give you slack on your rope."

Witness Nangle, having explained the process of taking off the spear and removing the tools under the circumstances here, testified: "I would raise the joint by means of an elevator. It is safer. I would not raise that joint of pipe above the roof; I would not consider it safe to do that."

Witness Hutchings testified: "I would not think it was equally safe to hoist that pipe way up to the top of the derrick out of the reach of the tools and then hoist the tools—not in my experience I would not." Speaking of the rope as attached in the present case and the pipe hoisted up as described, he testified: "It would not slip unless the tools caught it and raised it up and loosened the hitch. The timber hitch will hold the pipe safely, I suppose, if there is not anything to interfere with it. . . . You see, the tools are liable to catch on this joint here [indicating on model], and raise it up, and it will unhook the rope up there, if he was using a rope—raises that joint [indicating]; it would not be apt to unhook if he used the elevator. [Witness demonstrates pulling tools up, showing how they would catch on the pipe.] If the pipe was lifted in that manner, it would loosen timber hitch. . . . This pipe is bound to hang out of the perpendicular. The tools would catch on the bottom of the pipe and raise that up, and it will loosen that knot; then, when they drop back, of course, it will slip—bound to slip. If this rope was a one-inch manila rope, and wet at the time, it would make a lot of difference on the holding qualities of the rope, it would

be stiff, would not draw down tight; you could not make that knot as safe, it would not draw down as hard on the pipe, and would be more easily loosened, if anything raised the pipe and slackened the pull on the rope. If it was a manila rope and not a cotton rope, it would make a lot of difference—it is stiffer and won't draw down like this one. [Referring to sample piece of cotton rope in the courtroom.]''

Witness McManus testified: "I would not lift a pipe to the top of a derrick by means of a rope tied in a timber hitch. I would consider it careless on the part of a man who did that, as long as he had an elevator there to handle it."

Witness Harry Arundell testified: "Q. If, under the circumstances just stated, the driller hoisted the pipe to a great distance up in the derrick, up near the top, would you consider that a safe manner of proceeding or not? A. I would consider it dangerous to hoist anything to the top of the derrick by a rope, unless great care is taken. There would be danger of getting tangled up and falling, the knot slipping or becoming untied."

The height of the derrick is not certainly given by any witness. Witness Phillips thought it eighty-two feet; witness Harry Arundell stated that the standard derrick was eighty-two to eighty-four feet from below the crown-block to the ground. "The bottom of the casing-block, the hook, would be about ten feet under the crown; that would be about seventy-two feet up." Witness Phillips thought the tools were about forty-five feet long.

Expert witnesses called by defendant testified that a timber hitch, if properly tied, as the evidence showed was the case here, would not slip even though interfered with while holding up a pipe, for example, by the tools when elevated. But on this point the evidence is decidedly conflicting, as will be seen from the testimony introduced by plaintiff. There was sufficient evidence to justify the jury in finding that Mellen, who, for the time, represented the authority and responsibility of defendant, was guilty of negligence in raising the pipe so far above the roof of the derrick that the rope by which it was held suspended could not be seen, and leaving the pipe thus suspended at a height where the tools when elevated would interfere with it. Mellen was not at all certain to what height he lifted the pipe. He testified that "all he had to go by was the lines''; that "he could not say how high he hoisted

it. I figured on how much line I had. I went by the coils
on the shaft. . . . I figured on hoisting it to the blocks at the
top of the derrick—probably forty feet.'' In view of the tes-
timony that it was not necessary to take the obvious risk of
hoisting the pipe into a space of darkness and that in taking
this unnecessary course care was not observed to make sure
that the tools when elevated would not interfere with it, and
that if this happened, it was almost certain that the knot
would become loosened and the pipe slip through it, the jury
might well have inferred the negligence of defendant to have
been the proximate cause of the accident. The principles
enunciated in the cases cited by defendant, that negligence
will not be presumed merely from injury shown, or from facts
unexplained that an accident has occurred, and that the bur-
den of proof was on plaintiff to show defendant's negligence,
need not be gainsaid. But the law does not require in all
cases direct evidence of a fact in dispute. The law recog-
nizes the force of indirect evidence which tends to establish
such fact by proving another which, though not in itself con-
clusive, affords an inference or presumption of the existence
of the fact in dispute. (Code Civ. Proc., sec. 1832.) An in-
ference is a deduction which the reason of a jury makes from
the facts proved (Code Civ. Proc., sec. 1958) ; but an infer-
ence must be founded upon fact legally proved. (Code Civ.
Proc., sec. 1960.) The testimony showed that Mellen adopted
a plan of handling the tools and pipe, which the witnesses
testified was unsafe, by hoisting the pipe into a dark space
where the timber knot by which it was held could not be seen,
or any tendency of its slipping be observed, and by not using
the elevators which would have held the pipe in perfect se-
curity. This was his initial act of negligence, and it was fol-
lowed by another step, testified to as unsafe, which was to
elevate the tools without being assured that they would not
interfere with the pipe, knowing, as he must be presumed to
have known as a competent driller, that such interference
might loosen the knot holding the pipe and permit the pipe
to slip through. One or more of defendant's witnesses testi-
fied, and it is urged in argument, that the danger was not in-
creased by the height to which the pipe was hoisted, for had
it been raised but five or six feet and had fallen, it would as
surely have injured plaintiff. This suggestion ignores the
fact that had the pipe been raised but a few feet from the

floor, both plaintiff and Mellen could have observed any tendency of the pipe to slip, and, besides, there would in that case have been no tools hovering around the pipe and endangering the security of the knot in the rope.   Defendant contends that the testimony shows a clear space between the tools and the lower end of the pipe, and hence the impossibility of the tools having had anything to do with the pipe's slipping through the rope.   This contention is grounded on the assumption that Mellen hoisted the pipe to the top of the derrick, a fact not deducible from Mellen's testimony, the only witness who had any knowledge on the subject.   The estimates given of the inside height of the derrick, the length of the tools and pipe, and the pieces of rope and the blocks used on each would leave but a small, if any, margin of space between the tools and pipe.   Mellen said he hoisted the pipe probably forty feet; again, that he did not know how high he hoisted it; again, that it was a few feet from the top; again, that he had only the lines to go by or the coils on the shaft, but he did not say he counted the coils or examined his line.   If he hoisted the pipe only forty feet, it would not have cleared the tools, for they were forty-five feet long, as Phillips testified.   And this witness, who worked on this same derrick as driller, testified that the pipe "would have to get very near to the top to clear it from the tools."   Defendant further suggests that the evidence is as consistent with the theory that the rope was carelessly tied by plaintiff as that the pipe was raised and the rope loosened by the tools.   This suggestion derives no force from the testimony, for both plaintiff and Mellen testified that plaintiff tied a proper timber hitch, and the testimony of many witnesses was that a timber hitch properly tied is safe and not likely to loosen its grip.   We think the evidence was fairly responsive to the issues presented by the complaint and answer, and that there was sufficient evidence to justify the jury in attributing the injury to defendant's negligence.

It is contended that the injury to plaintiff was caused by an assumed risk.   In support of this contention it is claimed that plaintiff "had the same opportunity of observing the situation as Mellen had"; that "he was in as good a position as Mellen to notice the danger and risk of the business"; that it is not charged that the appliances furnished were not adequate and the place a safe one in which to work or that Mellen was an unskillful driller.   Under these circumstances it is

urged that plaintiff's injury ''was the result of an accident happening in the ordinary course of the business in which he was employed and the risk of which he assumed as one of the hazards of his employment.'' The rule is relied on as stated by Labatt: ''That a servant assumes all the ordinary risks which are incidental to his employment,'' and that, ''unless the plaintiff can adduce evidence which tends fairly to show that the injured person, by reason of his want of experience or his tender years, was not chargeable with that comprehension of the risk which, in the absence of such evidence, he is presumed to have possessed.'' (1 Labatt on Master and Servant, p. 2102.) Conceding the correctness of the rule, as it existed when the accident happened, that ''the servant assumes all the ordinary risks which are incidental to his employment,'' the question is, What is meant by the term, ''ordinary risks''? It certainly is not meant that the servant assumes all risks of injury that may result in the ordinary course of his employment, for the master, under such a rule, would never be held liable. We take it the ordinary risks which the servant assumes are such as may not be avoided by the exercise of reasonable care by the master or by his servant who is superior to the injured servant. It cannot be said that plaintiff and Mellen stood upon an equal footing or that plaintiff's opportunities of observing what Mellen was doing and how he was doing it were equal. Plaintiff could not know nor could he be presumed to have anticipated the possibility or probability of Mellen's not having hoisted the pipe sufficiently far to clear the tools. Plaintiff was in no situation to observe what Mellen was doing or how he was doing it. He was at his post of duty endeavoring to ''break'' the spear, ignorant of his position of danger caused by Mellen's carelessness and negligence. By the exercise of ordinary care on Mellen's part the accident would not have happened.

Appellant contends that plaintiff tied the timber hitch, raised the tools and moved the tools after they were raised, and hence if the tools caused the rope on the casing to be loosened, it was caused by plaintiff's negligence and he cannot recover. The testimony was that Mellen hoisted the pipe to a place above the roof and set his brake. Under Mellen's orders, and with his assistance, plaintiff hoisted the tools high enough above the floor to allow him and Mellen to remove

the spear. Mellen testified: "I pulled the tools up and prepared to take the spear out. . . . We pulled the tools up to the joint in the pipe, about even with the floor." What plaintiff did in the matter was done under Mellen's orders, with his personal assistance, and without any knowledge or comprehension of the dangerous position of the pipe, and it seems to us the jury were justified in finding that he acted as a reasonably prudent and cautious man would have acted under the circumstances. The accident did not happen by reason of hoisting the tools too far—they were raised only sufficiently high to admit of removing the spear. The cause of the accident, as the evidence warranted the jury in finding, was that the pipe was not hoisted high enough. Of course, it was incumbent upon plaintiff to exercise his senses and reasoning faculties, and whether he did so in the present case was to be determined by the jury taking into account all the attending circumstances. The accident cannot be traced to any act of plaintiff which was not performed in the line of his duty or directly ordered to be done by his superior. We do not think defendant sustained the burden of proving contributory negligence of plaintiff as the cause of his injury.

The point urged that plaintiff "was not injured by the negligent act of an employee of defendant having the right to direct and control his services," we think cannot be maintained. Section 1970 of the Civil Code provides that the "employer shall be liable for such injury when the same results from the wrongful act, neglect or default . . . of a person employed by such employer having the right to control or direct the services of such employee injured." It seems to us the testimony of both plaintiff and defendant showed very clearly that the work in and around an oil-well derrick is under the direct control of the driller. In the absence of the superintendent his authority is supreme. It is by virtue of this authority given by custom to the driller that he has the *right* to exercise it. One of defendant's witnesses, himself president or vice-president of several oil companies, testified: "In removing a pipe from the well, as in this case, in determining what was to be done with the top joint of casing, the driller would tell the tool-dresser what they were going to do, and that if the tool-dresser should say, 'No, I don't think that should be done,' the superintendent on the lease would get another tool-dresser, if I was the driller." We

have called attention, in the earlier part of this opinion, to sufficient testimony to show that Mellen had the right and exercised it to direct plaintiff in his work.

Error is claimed in the court's not allowing defendant to prove by witness Munzer the condition of the weather in Kern County at the time of the accident. It had been shown by plaintiff that it was raining the night of the accident, and the purpose of the offered evidence was not so much to dispute a fact of no great importance in the case as it was "in determining which party spoke the truth." The report offered was made up by the Kern County Land Company at Bakersfield from reports sent in by superintendents of farms in various part of the county. These reports were telephoned to the telephone operator in the office; he reported them to the stenographer, and she "makes the proper record of it." It was a purported copy of this record that was offered. Aside from its nonofficial and hearsay character, the reports from the Kern County Land Company's farms would not disprove that it rained at the oil well in question. The ruling was not error.

Error is claimed in giving the following instruction: "Presumptive or circumstantial evidence is admissible in civil cases. When direct evidence cannot be produced, minds will form their judgments on circumstances. So in this case it is not necessary that the plaintiff produce direct evidence as to what caused the casing, mentioned in this case, to fall, if any casing did fall, but such cause may be inferred from all of the circumstances in the case." It is contended that "a jury is not permitted to infer the negligence of a defendant from circumstances unless they are strong enough and convincing enough to exclude every other reasonable hypothesis than that of negligence." We have already referred to the law that the fact of negligence may be proved by indirect as well as by direct evidence. (*Jones* v. *Leonardt,* 10 Cal. App. 284, [101 Pac. 811]; Code Civ. Proc., sec. 1832.) Negligence, like any other fact, may be inferred from a preponderance of the evidence, whether it be circumstantial or direct, and plaintiff is not required to prove his case beyond a reasonable doubt. The instruction, fairly considered, merely told the jury that they were at liberty to determine the question of defendant's negligence from evidence other than direct proof of the cause of the accident.

The court refused the instruction, requested by defendant, to the effect that the jury should not be governed by sympathy but by the evidence, and that in considering the evidence the jury should not be influenced by the fact that plaintiff is a laboring man and defendant a corporation. A jury sworn to try the case and a true verdict render upon the evidence must be presumed to have obeyed their oath, and, unless it should appear that they were influenced by sympathy or prejudice and not by the evidence, we must presume that their verdict was based upon the evidence. Nothing in the record tends to show that the jury acted out of sympathy for plaintiff or through prejudice against defendant.

An instruction asked by defendant was refused in which the jury were told that plaintiff could not recover "unless they find he has a preponderance of evidence supporting the following propositions: First, that the plaintiff was not at the time of the accident guilty of any failure to exercise ordinary care for his own safety which approximately contributed to his injury; second, that the defendant was guilty of negligence in the manner charged in the complaint; third, that such negligence was the proximate or direct cause of the plaintiff's injuries in question"; and that if plaintiff has failed to sustain by evidence these propositions or any one of them, he cannot recover. The first subdivision of this instruction is in effect an instruction that the burden is upon plaintiff to show by a preponderance of the evidence that he was not guilty of contributory negligence. For one who fails to exercise ordinary care for his own safety, and he is injured in consequence thereof, certainly contributes thereto. But this issue was presented by defendant, and upon it rested the burden of establishing it by a preponderance of evidence and not upon plaintiff to prove the negative of that issue. That it was necessary for plaintiff to show that defendant was guilty of the negligence charged and that such negligence was the proximate cause of plaintiff's injuries, is undoubtedly true. Defendant was entitled to these instructions, and plaintiff claims they were elsewhere given in the charge, which is not denied, but defendant contends that "if counsel wished these instructions to be considered, they should have incorporated them in the record. Not having done so, they cannot now rely upon them to show no error was committed by the refusal of the lower court to give the instructions." The

transcript does not purport to contain all the instructions, and it is apparent that it does not. Error must be shown, and if equivalent instructions, though not in the same language, were given, no error was committed. If no such instructions were given, it was defendant's duty so to show. We have seen that the evidence was sufficient to justify the jury in finding the fact that defendant was guilty of negligence as charged and as the issues were tried, and that such negligence was the proximate or direct cause of plaintiff's injuries. Under such circumstances defendant was not prejudiced by the ruling of the court.

Instructions, given by the court, numbered 12 and 15, are criticised, for the reason that by No. 12 "the jury were told that dangerous appliances or a danger in the work did not bar the right of the plaintiff to recover unless the employee 'fully understood, comprehended, and appreciated' the danger"; and that in No. 15 the instruction "assumes the existence of facts not in evidence." Instruction numbered 12 is the statement of the law as found in section 1970 of the Civil Code, and read in its entirety is not error, and if not applicable we cannot see that it could have been prejudicial. Instruction numbered 15 appears to us to have been drawn with strict adherence to evidence admitted at the trial. It does not assume the existence of any facts. It stated: "If you believe from evidence that," etc.

We have given the case such attention as its importance seems to have demanded, and, finding no prejudicial error in the record, the judgment and order are affirmed.

Hart, J., and Ellison, J., *pro tem.*, concurred.